UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMA FINANCIAL, LLC,

                              Plaintiff,

              -against-

AIM EXPLORATION, INC., and
AIM EXPLORATION, SA,

                              Defendants.

---

**OPINION & ORDER**

18 Civ. 145 (ER)

Ramos, D.J.:

    In this civil action, EMA Financial, LLC ("EMA" or "Plaintiff"), sues AIM Exploration,

Inc. ("AIM-Inc."), and AIM Exploration, SA ("AIM-SA," and collectively with AIM-Inc.,

"Defendants"), alleging breach of several agreements related to EMA's purchase of a convertible

promissory note from AIM-Inc.[1]

    Before the Court are two motions.  First, EMA moves for partial summary judgment.

Doc. 20.  Second, Defendants cross-move for judgment on the pleadings on grounds that the

agreements EMA seeks to enforce are criminally usurious and thus void.  Doc. 27.  For the

reasons set forth below, EMA's motion for partial summary judgment is GRANTED in part and

DENIED in part, and Defendants' cross-motion for judgment on the pleadings is DENIED.

---

[1] This action is the latest in a string of actions brought in this District and in the Eastern District of New York over
the last twelve months, all involving (1) alleged breaches of nearly identical convertible promissory notes and (2)
affirmative defenses based principally on New York's criminal usury statute.  Indeed, neither Defendants nor their
counsel are strangers to these actions.  *See, e.g., Adar Bays, LLC v. Aim Expl., Inc.*, 285 F. Supp. 3d 698 (S.D.N.Y.
2018); *LG Capital Funding, LLC v. Aim Expl., Inc.*, No. 17 Civ. 3118 (DAB), 2018 WL 4119149 (S.D.N.Y. Aug.
29, 2018); *LG Capital Funding, LLC v. WindStream Techs., Inc.* No. 17 Civ. 4394 (DAB), 2018 WL 4119158
(S.D.N.Y. Aug. 29, 2018); *Adar Bays, LLC v. GeneSys ID, Inc.*, 341 F. Supp. 3d 339 (S.D.N.Y. 2018); *Blue Citi,
LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326 (S.D.N.Y. 2018); *Adar Bays, LLC v. 5Barz Int'l, Inc.*, No. 16 Civ. 6231
(NRB), 2018 WL 3962831 (S.D.N.Y. Aug. 16, 2018).

## I. BACKGROUND[2]

EMA is a limited liability company that is organized under the laws of Delaware and conducts business in New York City. *See* Compl. ¶ 3, Doc. 1. AIM-Inc. is a Nevada corporation that maintains a principal place of business in Nevada. Answer ¶ 4, Doc. 12. AIM-SA is a Peruvian entity and a wholly owned subsidiary of AIM-Inc., with its principal place of business also in Nevada. *Id.* ¶ 5.

On September 17, 2015, AIM-SA, AIM-Inc., and EMA executed a Securities Purchase Agreement ("SPA").[3] *See* Decl. of Felicia Preston Ex. B ("SPA") at 1, Doc. 19-2. The SPA provided for the purchase by EMA of a 12% Convertible Redeemable Promissory Note (the "Note"), issued on that same date, from AIM-Inc. *See id.* at 1. Pursuant to the Note, EMA tendered to AIM-Inc. $40,000. In exchange for the $40,000, AIM-Inc. promised to repay EMA $40,000, together with interest on the unpaid principal balance at the rate of 12% per annum, by September 17, 2016—the Note's maturity date. Preston Decl. Ex. A ("Note") at 1, Doc. 19-1; *id.* § 1.2. And, in the SPA, AIM-SA guaranteed to EMA the "prompt and complete payment and performance" of AIM-Inc.'s obligations under the Note. SPA at 23.

---

[2] The following facts are drawn from the parties' Rule 56.1 Statements, supporting exhibits, and pleadings. The facts recounted are undisputed unless noted otherwise.

[3] In answering a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, litigants in this District are required by our Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support their position by citing to admissible evidence in the record. *See* Local Rule 56.1(b)–(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). Accordingly, when analyzing the instant motions, the Court will disregard averments in the parties' 56.1 Statements that are not supported by citations to admissible evidence in the record, or that are contradicted by other admissible evidence in the record, or that are improper legal arguments. Here, for example, in responding to EMA's 56.1 Statement, Defendants dispute that they executed the SPA with EMA on September 17, 2015. *See* Defs.' Rule 56.1 Resp. ¶ 1. However, Defendants proffer no evidence to support this dispute; the SPA is dated September 17, 2015, and is signed by all three parties, *see* Doc. 1; and Defendants appear to abandon this dispute in their moving papers. Accordingly, the Court will disregard any purported dispute as to the date of the SPA's execution.

### A.  **The Note, SPA, and TA Letter**

Notwithstanding that AIM-Inc. agreed to repay principal and interest owed to EMA by

September 17, 2016, the Note and SPA contained several provisions that provided EMA with the

option to convert the outstanding balance on the Note into shares of AIM-Inc. common stock in

lieu of monetary repayment.  Below, the provisions relevant to the instant motions are reprinted

in summary fashion.

### 1.  Conversion Rights

As the title "*Convertible* Redeemable Promissory Note" suggests, in section 1.1 of the

Note the parties agreed that EMA would hold the right to convert any portion of the amount

outstanding on the Note into shares of AIM-Inc. common stock.  *See* Defs.' Rule 56.1 Resp. ¶ 3,

Doc. 26.  Specifically, AIM-Inc. agreed that EMA

> shall have the right, in its sole and absolute discretion, at any time and from time
> to time to convert all or any part of the outstanding amount due under this Note
> into fully paid and non-assessable shares of [c]ommon [s]tock . . . or any shares of
> capital stock or other securities of [AIM-Inc.] into which such [c]ommon [s]tock
> shall hereafter be changed or reclassified at the conversion price (the "Conversion
> Price") determined as provided herein (a "Conversion").

Note § 1.1.

### 2.  Conversion Price

In section 1.2(a) of the Note, the parties agreed that the Conversion Price would be set as

follows:

> The . . . Conversion Price . . . shall equal the lower of:  (i) the closing sale price of
> the Common Stock on the Principal Market on the Trading Day immediately
> preceding the Closing Date, and (ii) 55% of the lowest sale price for the Common
> Stock on the Principal Market during the twenty (20) consecutive Trading Days
> immediately preceding the Conversion Date, *provided, however,* . . . if the closing
> sale price at any time falls below [$]0.10 then such 55% figure . . . above shall be
> reduced to 40%.  Additionally, . . . if the Note cannot be converted into free

trading shares after 181 days from the issuance date, an additional 15% discount will be attributed to the Conversion Price.

*Id.* § 1.2.

### 3. Share Reserves and Transfer Agent Instructions

In section 1.3 of the Note, the parties agreed that AIM-Inc. would hold in reserve for EMA enough authorized and unissued shares of AIM-Inc. common stock to allow EMA to convert the outstanding balance on the Note into AIM-Inc. shares:

> [AIM-Inc.] covenants that [it] will at all times while this Note is outstanding reserve from its authorized and unissued [c]ommon [s]tock a sufficient number of shares, free from preemptive rights, to provide for the issuance of [c]ommon [s]tock upon the full conversion of this Note. [AIM-Inc.] is required at all times to have authorized and reserved four (4) times the number of shares that is actually issuable upon full conversion of this Note . . . . Initially, [AIM-Inc.] will instruct the Transfer Agent to reserve seven hundred and thirty thousand (730,000) shares of common stock in the name of [EMA] for issuance upon conversion hereof.

*Id.* § 1.3.

To effectuate transfer of common stock upon conversion, section five of the SPA required AIM-Inc. to provide certain "irrevocable" instructions to its transfer agent:

> 5. Transfer Agent Instructions.  Upon receipt of a duly executed Notice of Conversion, [AIM-Inc.] shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of [EMA] or its nominee, for the Conversion Shares in such amounts as specified from time to time by [EMA] to [AIM-Inc.] upon conversion of the Note, or any part thereof, in accordance with the terms thereof.

SPA § 5.  To that end, on the same date of the Note's execution, AIM-Inc. wrote a letter to its transfer agent that instructed it to register and reserve "a sufficient number of shares" (initially, 730,000) for EMA in case of conversion.  *See* Preston Decl. Ex. C (the "TA Letter"), Doc. 19-3.

The TA Letter also provides that

> [t]he amount of Common Stock so reserved may be increased, from time to time, by written instructions of the Investor *without any further action or confirmation*

> *by [AIM-Inc.].* [EMA] shall have the right to periodically request, *without any further action or confirmation by [AIM-Inc.]*, that the number of Reserved Shares be increased so that the number of Reserved Shares at least equals *400%* of the number of shares of [AIM-Inc.] common stock issuable upon conversion of the Note.

*Id.*

### 4. Notice of Conversion

Pursuant to section 1.4 of the Note, EMA may convert to common stock any portion of the amount owed to it under the Note by submitting to AIM-Inc. a "Notice of Conversion" via facsimile, e-mail, or "other reasonable means of communication dispatched on the Conversion Date prior to 11:59 p.m., New York, New York time." Note § 1.4.

### 5. Default Provisions and Injunctive Relief

The Note describes several events that would constitute default under the Note. Relevant here, section 3.2 provides for default if AIM-Inc. fails to issue shares of common stock to EMA upon EMA's exercise of its conversion rights. *Id.* § 3.2. Section 3.3 of the Note provides for default if AIM-Inc. "breaches any material covenant or other material term of condition contained in this Note and any collateral documents including but not limited to the [SPA]." *Id.* § 3.3. Section 3.4 of the Note provides for default if AIM-Inc. makes any false or misleading representations, warranties, or statements in connection with the Note, SPA, or accompanying agreements that results in a material adverse effect on EMA's rights with respect to the Note or SPA. *Id.* § 3.4. And section 3.9 provides for default if AIM-Inc. "fail[s] to comply in any material respect with the reporting requirements of the Exchange Act; and/or [AIM-Inc.] . . . cease[s] to the subject to the reporting requirements of the Exchange Act." *Id.* § 3.9.

Upon default, the Note becomes "immediately due and payable" to EMA. *Id.* § 3.16. Moreover, the Note provides that EMA could collect a "default sum," defined as "the then

outstanding principal amount of th[e] Note to the date of payment <u>plus</u> the amounts referred to in clauses (x), (y), and (z)" of the Note.[4]  *Id.*  The Note also provides that "[a]ny amount of principal or interest . . . which is not paid when due shall bear interest at the rate of twenty-four (24%) per annum from the due date thereof until the same is paid ("Default Interest")."  Note at 1.  The Note further provides for the issuance of injunctive relief in the event of default:

> 4.10. <u>Remedies</u>. [AIM-Inc.] acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to [EMA], by vitiating the intent and purpose of the transaction contemplated hereby.  Accordingly, [AIM-Inc.] acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by [it] of the provisions of this Note, that [EMA] shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof. . . .

*Id.* § 4.10; *see also* SPA at 8(p) (providing same).

## 6.  SEC Filing Requirements and Governing Law

Pursuant to section 10(c) of the SPA, AIM-Inc. agreed to "timely and voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to [§] 12(g) of the 1934 Act, whether or not [AIM-Inc.] is then subject to such reporting requirements, and comply with all requirements related to any registration statement filed pursuant to th[e SPA]."  Moreover, the parties agreed that the SPA would be governed by and construed in accordance with New York State law, and further agreed that any actions concerning the transactions contemplated in the SPA shall be brought only in the state or federal courts located in the State and County of New York.  *Id.* § 10(a).

---

[4] "Clause (x)" of the Note refers to "accrued and unpaid interest on the unpaid principal amount of th[e] Note to the date of payment;" "clause (y)" refers to the default interest accrued on the then-outstanding principal and unpaid interest; and "clause (z)" refers to any amounts owed to EMA as a result of its conversion of principal to shares of common stock.  *See* Note § 3.16.

### 7. AIM-SA's Guaranty

Finally, as mentioned earlier, the SPA contains an unconditional guaranty whereby AIM-SA agreed to guarantee the prompt and complete payment and performance by AIM-Inc. of all amounts and obligations due under the Note. *See* SPA at 23.

### B. **Alleged Breach of the Note and SPA**

EMA alleges that Defendants materially breached their obligations under the Note and SPA in four ways. First, EMA claims that AIM-Inc. failed to file its Form 8-K with the Securities and Exchange Commission ("SEC") when due on January 20, 2017, notwithstanding its representations in the Note and SPA to comply with all applicable reporting requirements. Pl.'s Mem. of Law in Supp. of its Mot. for Partial Summ. J. ("Pl.'s Mem.") at 6–7, Doc. 20. Second, EMA claims that AIM-Inc. materially breached its obligations under the agreements when it switched transfer agents on March 9, 2016, without establishing a new share reserve with the new transfer agent. *Id.* at 7. And finally, EMA claims that AIM-Inc. twice breached its agreements with EMA when it failed to honor two Notices of Conversion that sought to convert $642.05 and $23,772.61 of the Note into 2,334,744 and 29,715,761 shares of AIM-Inc. common stock, respectively. *Id.*

### C. **Procedural History**

EMA filed suit against Defendants on January 9, 2018. In its Complaint, EMA asserts claims against Defendants for breach of contract and breach of guaranty, and it seeks (1) more than $1,215,357 in damages; (2) an order permanently enjoining AIM-Inc. from breaching its obligations under the Note and SPA; and (3) an award of costs and expenses in prosecuting this action, including reasonable attorneys' fees. Compl. ¶¶ 43–77.

On February 9, 2018, Defendants answered EMA's Complaint. In their Answer (and in opposing EMA's motion for partial summary judgment), Defendants concede that they failed to honor EMA's two Notices of Conversion and that they failed to establish new share reserves of common stock after switching transfer agents. *See* Answer ¶¶ 32–33, 35–37; Defs.' Mem. of Law in Opp. to Pl.'s Mot. for Partial Summ. J. and in Supp. of Defs.' Cross-Mot. to Dismiss Pursuant to FRCP 12(C) ("Defs.' Mem.") at 3–4, Doc. 24; Decl. of James Robert Todhunter ("Todhunter Decl.") ¶¶ 14–17, Doc. 25.[5] However, as an affirmative defense, Defendants claim that EMA's action to enforce the Note is barred by the doctrine of unclean hands because the Note and its accompanying agreements are criminally usurious.

On April 16, 2018, EMA moved for partial summary judgment, seeking judgment as a matter of law on its claims for breach of contract, breach of guaranty, and attorneys' fees. *See* Pl.'s Mem. at 1, 19. EMA also moved to strike Defendants' affirmative defense.

Defendants, in turn, moved for judgment on the pleadings, requesting that the Court to find the Note criminally usurious under New York law and therefore void. *See* Defs.' Mem. at 1.

This Court has diversity jurisdiction over the instant action, given that the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. U.S.C. § 1332(a)(2). Through execution of the SPA and Note, the parties have also consented to venue in this District. *See supra* Part I.A.6.

---

[5] The Court notes that Defendants, in opposing summary judgment, dispute EMA's assertion that AIM-Inc. failed to file timely reports with the SEC. *See* Defs.' Rule 56.1 Resp. ¶ 16; Todhunter Decl. ¶ 2. However, in answering EMA's Complaint, Defendants expressly *admitted* that AIM-Inc. failed to file a Form 8-K with the SEC when due. *See* Answer ¶ 32, Doc. 12 ("Admit failing to file [F]orm[-]8[K] with the SEC and becoming delinquent in its filing on January 20, 2017"). And Defendants have not moved to amend their pleading. In any event, the Court need not determine whether this dispute of fact is genuine. Instead, the Court simply finds this dispute immaterial, given that Defendants have conceded to other acts and omissions that breach their obligations under the Note and SPA. *See supra* Part I.C.

## II.    STANDARD OF REVIEW

### A.  Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." In adjudicating a motion for judgment on the pleadings pursuant to Rule 12(c), the Court applies the same standard of review as it does to a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). Accordingly, a motion for judgment on the pleadings should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam).

In adjudicating a motion for judgment on the pleadings, the Court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks omitted). The Court also considers any documents incorporated into the Complaint by reference or integral to the Complaint, provided there is no dispute regarding their authenticity, accuracy, or relevance. *Id.* Finally, the Court accepts as true the Complaint's factual allegations and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

### B.  Summary Judgment Pursuant to Fed. R. Civ. P. 56

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a

reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

In deciding a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmovant and resolves all ambiguities and draws all reasonable inferences against the movant.  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).  The nonmovant, however, may not rely on unsupported assertions or conjecture in opposing summary judgment.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  Rather, the nonmovant "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 256–57 (1986)).

## III.  DISCUSSION

The Court first turns to Defendants' cross-motion for judgment on the pleadings, which the Court ultimately denies in its entirety.  The Court then turns to EMA's motion for partial summary judgment, which it ultimately grants in part and denies in part.

## A. **Defendants' Cross-Motion for Judgment on the Pleadings**

Defendants' cross-motion for judgment on the pleadings is based solely on the ground that the Note violates N.Y. Penal Law § 190.40—New York's criminal usury statute—rendering the Note void *ab initio*. *See* Defs.' Mem. at 1, 24–26. In support of their argument, Defendants point to three features of the Note they claim should be considered additional interest: (1) the "conversion discount" provided to EMA; (2) the value of the shares initially reserved to EMA; and (3) the penalties prescribed in the Note in the event of default.[6]

### 1. **Legal Standard: Civil and Criminal Usury**

New York has two usury statutes, one civil and one criminal. The civil usury statute, section 5-501 of the New York General Obligations Law, provides that a loan or forbearance is usurious when the lender charges an interest rate exceeding 16% per annum. *See* N.Y. Gen. Oblig. Law §§ 5-501(1)–(2) (McKinney 2011). If the loan agreement includes an interest rate that exceeds 16% per annum, then that agreement is void and unenforceable. *Carlone v. Lion & the Bull Films, Inc.*, 861 F. Supp. 2d 312, 321 (S.D.N.Y. 2012) (citing N.Y. Gen. Oblig. Law § 5-501)). Corporations—like the parties in this case—may not assert civil usury as a defense in litigation. *See* N.Y. Gen. Oblig. Law § 5-521(1) (McKinney 1974).

Corporations may assert criminal usury as an affirmative defense, however. *See* N.Y. Gen. Oblig. Law § 5-521(3) ("The provisions of subdivision one of this section shall not apply to any action in which a corporation interposes a defense of criminal usury as described in section 190.40 of the penal law."); *see also Madden v. Midland Funding*, LLC, 237 F. Supp. 3d 130, 146 (S.D.N.Y. 2017) ("[W]hile private parties cannot initiate, and federal courts cannot entertain,

---

[6] The Note, SPA, and TA Letter are attached to EMA's Complaint and incorporated by reference therein. Accordingly, in adjudicating Defendants' cross-motion for judgment on the pleadings, the Court considers the contents of those documents without converting Defendants' motion into one for summary judgment. *See Vail v. City of New York*, 68 F. Supp. 3d 412, 420 (S.D.N.Y. 2014).

prosecutions for violation of state criminal laws, defendants (including corporate defendants) may assert a defense of criminal usury.").  Under New York law, a loan or forbearance is criminally usurious when the lender knowingly charges an interest rate of 25% or more.  *See* N.Y. Penal Law § 190.40 (McKinney 1976).  The "knowledge" requirement is satisfied with proof of a general intent to charge more than the legal rate of interest, as opposed to a specific intent to violate the criminal usury statute.  *See, e.g.*, *LG Capital Funding, LLC v. AIM Expl., Inc.*, No. 17 Civ. 3118 (DAB), 2018 WL 4119149, at *3 (S.D.N.Y. Aug. 29, 2018).  "Usury is an affirmative defense[,] and a heavy burden rests upon the party seeking to impeach a transaction for usury."  *Id.* (quoting *Hillair Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 339 (S.D.N.Y. 2013)); *accord Greenfield v. Skydell*, 588 N.Y.S.2d 185, 185 (App. Div. 1st Dep't 1992) ("A defendant seeking to interpose the defense of usury must prove all of the essential elements thereof by clear evidence.").

Finally, while Defendants argue that a finding of criminal usury in this case would render the Note and accompanying agreements void *ab initio*, there is no specific statutory authority for voiding a loan that violates the criminal usury statute only.  *See Adar Bays, LLC v. GeneSys ID, Inc.*, 341 F. Supp. 3d 339, 352 (S.D.N.Y. 2018) (quoting *In re Venture Mortg. Fund, L.P.*, 282 F.3d 185, 90 n.4 (2d Cir. 2002) ("§5-511 voids a loan that violates the civil usury statute (§ 5-501) but says nothing about a loan that violates the criminal usury statute. . . . So there seems to be no specific authority for voiding a loan that violates the criminal usury statute without violating the civil usury statute.")); *accord Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC*, No. 13 Civ. 6562 (RJS), 2015 WL 4392081, at *5 n.4 (S.D.N.Y. July 15, 2015) ("If the Court were to find that the Agreement contravened New York's criminal usury law, the Court would nevertheless *not* void the Agreement *ab initio*, but would rather revise the interest

obligation to require a non-usurious rate." (emphasis added)). *But see Union Capital LLC v. Vape Holdings Inc.*, No. 16 Civ. 1343 (RJS), 2017 WL 1406278, at *4 (S.D.N.Y. Mar. 31, 2017) ("Under New York law, a contract is criminally usurious, *and thus void*, when the parties knowingly provided for an interest rate of 25% or more." (emphasis added)); *Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*, 9 N.Y.S.3d 682, 683 (App. Div. 1st Dep't 2015) (finding void a promissory note between two corporations that contained a criminally usurious internet rate).

### 2. Analysis[7]

In the instant case, the Note carries an interest rate of 12% per annum on its face.[8] "When a note is not usurious on its face, a court will not presume usury; rather, the party asserting the defense must prove all the elements, including usurious intent." *LG Capital Funding, LLC v. ExeLED Holdings Inc.*, No. 17 Civ. 4006 (RJS), 2018 WL 6547160, at *5 (S.D.N.Y. Aug. 28, 2018) (internal quotation marks omitted). Consequently, "the Court turns to the substance of the transaction to determine whether the effective rate of interest exceeds 25%." *Union Capital*, 2017 WL 1406278, at *4.

---

[7] At the outset, EMA contends that Defendants cannot rely on the affirmative defense of criminal usury to prevent EMA's enforcement of the Note's terms because the Note constituted an *investment*, not a "loan or forbearance" as contemplated by New York's usury statutes. See Pl.'s Mem. at 20. In response, Defendants spend much of their moving papers explaining why, in their view, the Note and its supporting documents reflect a loan agreement, as opposed to an investment agreement. The Court concludes that it need not determine whether the Note did, in fact, contemplate a loan. Instead, the Court assumes *arguendo* that the Note is a loan and ultimately concludes Defendants' usury defense fails on the merits.

[8] The Court notes that Defendants argue—albeit inconsistently—that the Note is criminally usurious on its face. *Compare, e.g.*, Defs.' Mem. at 24 ("The four corners of the Note establish that the Note, on its face, violates New York's criminal usury statute as a matter of law."), *with, e.g.*, *id.* at 1–2 ("[N]o matter how *cleverly hidden*, the undisputed and indisputable facts demonstrate that these financial instruments . . . include provisions that result in charges well above the permissible interest rate under New York Law."), *and* Defs.' Mem. of Law in Reply to Pl.'s Opp. to Defs.' Cross Mot. to Dismiss Pursuant to FRCP 12(C) ("Defs.' Reply") at 8 ("The Note's conversion feature . . . *should be added* to the *face interest amount of 12%* per annum." (emphases added)). Nevertheless, the Court concludes, as a matter of law, that the Note is not usurious on its face and will therefore not presume usury. *Cf. Adar Bays, LLC v. GeneSys ID, Inc.*, 341 F. Supp. 3d 339, 353 (S.D.N.Y. 2018).

### (a) *Value of Conversion Price Discounts Does Not Render the Note Usurious*

Defendants argue that the value of the conversion discounts provided to EMA in the Note constitutes additional interest that should be included in the Court's criminal usury analysis. Defs.' Mem. at 14. In other words, Defendants ask the Court to consider the potential profit EMA may reap by converting amounts due under the Note into shares of AIM-Inc. at a substantial discount from the market price when determining the Note's real interest rate. In support of their argument, Defendants cite myriad cases they claim support their assertion that the option to convert a loan's principal into discounted shares of common stock is an item of value that *must* be considered as interest in a criminal usury analysis. *See* Defs.' Mem. at 14–15 (citing, e.g., *Phlo Corp. v. Stevens*, No. 00 Civ. 3619, 2001 WL 1313387, at *4–5 (S.D.N.Y. Oct. 25, 2001), *aff'd*, 62 F. App'x 377 (2d Cir. 2003); *Hillair*, 963 F. Supp. at 338; *Sabella v. Scantek Med., Inc.*, No. 08 Civ. 453 (CM), 2009 WL 3233703, at *17–18 (S.D.N.Y. Sept. 21, 2009); *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc.*, 961 N.Y.S.2d 86, 88–90 (App. Div. 1st Dep't 2013)). The Court disagrees with Defendants.

At the outset, the Court notes that Defendants mischaracterize the forgoing case law. For example, Defendants cite *Phlo Corporation v. Stevens* as holding that a "contingent right of stock option[s] is something of value to be considered in [a] usury analysis." Defs.' Mem. at 15. But *Phlo* says no such thing. On the contrary, *Phlo* holds that "[a]n agreement to pay an amount which may be more or less than the legal interest, depending upon a reasonable contingency, is *not* ipso facto usurious, because of the *possibility* that more than legal interest must be paid." 2001 WL 1313387, at *4 (emphases added) (citation omitted); *cf. id.* ("A loan is usurious where the lender is entitled to the return of the principal and the full legal rate of interest *plus a bonus* to

be paid upon a contingency over which the borrower has no control." (emphasis added) (internal quotation marks omitted)).

Defendants' reliance on the other cited cases fares no better, as each case concerned agreements that required deliveries of stock shares *in addition to* principal repayment, as opposed to deliveries of stock shares *in lieu* of principal repayment. *See, e.g.*, *Hillair*, 963 F. Supp. at 338 (taking common stock into account as additional interest where agreement provided for $165,000 to be repaid to lender by a date certain, plus interest, *plus* 500,000 shares of the borrower's common stock, *plus* $15,000 in "reimbursements" for the lender's purported expenses in making the loan); *Sabella*, 2009 WL 3233703, at *17 ("Sagi's argument that the August 2002 Note is usurious depends on a finding that Sabella . . . was entitled to receive . . . common stock *as additional consideration* for making the loan." (emphasis added)); *Blue Wolf*, 961 N.Y.S.2d at 88–90 (finding note's requirement of a $200,000 deposit to lender "against future commitment fees" constituted additional interest where the parties agreed that the deposit would be rolled over into a future financing agreement, but if the parties failed to consummate another agreement—for any reason—by a date certain, then the lender could retain the $200,000 "in its sole discretion").

In the instant case, EMA possessed a right to receive shares of AIM-Inc. common stock *in lieu of* monetary payment, not *in addition* to monetary payment. And, notwithstanding Defendants' arguments, the case law in this District is uniform in holding that the value of conversion discounts should not factor into the usury analysis. The reason for this holding is straightforward: The value of the conversion discount simply is too uncertain to include in a usury analysis. For one thing, "even if [EMA] chose to convert the loan principal into shares, any potential profit [EMA] might realize would still be dependent on the market price [of the

shares] at the time of conversion and so, therefore, would be too uncertain to incorporate into an interest rate calculation." *Union Capital*, 2017 WL 1406278, at *5 (citation omitted). Of course, as some courts have observed, "[a]ssuming full liquidity and immediate disposition, the profit realized from the purchase of stock at a fixed percentage discount at a fixed overall purchase price should generally be the same regardless of the undiscounted price of the stock. However, stock is not necessarily fully liquid and it cannot always be disposed immediately." *Adar Bays, LLC v. Aim Expl., Inc.*, 285 F. Supp. 3d 698, 702 (S.D.N.Y. 2018). Furthermore, "there is no guarantee that [EMA] could realize a fixed profit by reselling the stock since it is possible that the price of the stock would decrease immediately following submission of a notice of conversion." *Id.*; *see also GeneSys ID*, 341 F. Supp. 3d at 356 (explaining same).

Indeed, several courts in this District have expressly held that "New York's usury laws do no not apply to an option to convert a loan's principal into shares of stock." *Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 335 (S.D.N.Y. 2018); *see also id.* ("Once a loan's principal is converted to shares, the transaction takes on 'the character of an equity investment,' and the usury laws no longer apply." (quoting *Beaufort Capital Partners v. Oxysure Sys., Inc.*, 16 Civ. 5176 (JPO), 2017 WL 913791, at *3 (S.D.N.Y. Mar. 7, 2017))); *Union Capital*, 2017 WL 1406278, at *5; *LG Capital Funding, LLC v. 5Barz Int'l*, 307 F. Supp. 3d 84, 98–99 (S.D.N.Y. 2018) (collecting cases). Consequently, in line with other courts in this District, the Court concludes that the value of the conversion discount contained in the Note should not be included in the Court's usury analysis.

**(b)** ***Requirement of Share Reserves Does Not Render the Note Usurious***

Next, Defendants argue that the Note is criminally usurious because it requires AIM-Inc. to reserve a substantial amount of shares of common stock—730,000 initially—in the event

EMA exercises its conversion rights. Defs.' Mem. at 17. In particular, Defendants argue that the reservation of shares violated New York General Obligations Law § 5-511(1), which provides that "[a]ll . . . notes, . . . whereupon or whereby there shall be *reserved or taken, or secured or agreed to be reserved or taken*, any greater sum, or greater value, for the loan . . . of any money . . . , than is prescribed in section 5–501, shall be void." N.Y. Gen. Oblig. Law § 5-511(1) (McKinney 1968). Defendants proffer evidence tending to show that the value of the shares reserved at the time of the Note's execution was $292,000.00 (that is, seven times the principal amount), a value that EMA does not dispute. *See id.* at 18.[9]

The problem with Defendants' argument, however, is manifest. As several courts in this District have correctly observed, "on its face, § 5-511 applies to civil, not criminal usury," and "[c]orporations, including Defendant[s] in this case, cannot assert a civil usury defense." *LG Capital Funding*, 2018 WL 4119149, at *5; *see also Adar Bays, LLC v. Aim Expl., Inc.*, 310 F. Supp. 3d 454, 455 (S.D.N.Y. 2018) ("§5-501 is New York's civil usury state, and therefore, on its face § 5-511 is a statute applicable to the defense of civil usury, not criminal usury as alleged by Aim Exploration."). Moreover, as several courts have explained in analyzing virtually identical notes, "the reservation of shares [i]s not an independent payment to [the lender], but merely a mechanism by which to effectuate the share conversion as envisioned by the Note and the SPA. Since the share conversion feature does not render the agreement usurious, neither does the reservation of shares provision." *Adar Bays, LLC v. Aim Expl.*, 285 F. Supp. 3d 698, 704 (S.D.N.Y. 2018); *GeneSys ID*, 341 F. Supp. 3d at 356 (quoting same); *Adar Bays, LLC v. 5Barz Int'l, Inc.*, No. 16 Civ. 6231 (NRB), 2018 WL 3962831 (S.D.N.Y. Aug. 16, 2018) (quoting same). Indeed, here "[t]he Note did not require the share reserve to be paid to Plaintiff;

---

[9] The Court makes no finding in this Opinion & Order as to the value of the shares initially reserved in connection with the Note's execution.

it was simply security that Defendant[s] w[ere] required to set aside so that there would be shares available if Plaintiff exercised its conversion option." *Blue Citi,* 338 F. Supp. 3d at 336.

Under these circumstances, the Court sees no reason to include into the usury analysis the value of shares reserved for, but never tendered to, EMA upon the Note's execution.

### (c) *The Default Provisions Do Not Render the Note Criminally Usurious*

As noted above, *see supra* Part I.A.5, in the event of default, the Note provides for payment of a "default sum" to EMA, in addition to a default interest rate of 24% per annum. Defendants argue that the default provisions violate New York's criminal usury statute and are unconscionable. *See* Defs.' Mem. at 19–20. Not so.

At the outset, the Court notes that EMA, in moving for partial summary judgment, has not sought to enforce any claimed entitlement to the "default sum," *see* Pl.'s Reply at 16 n.3—a decision likely for the best, as courts in this District have struck down similar provisions as unenforceable. *See, e.g.*, GeneSys, 341 F. Supp. 3d at 349 ("Where a liquidated damages provision does not serve the purpose of reasonably measuring the anticipated harm, and is instead punitive in nature, it will not be enforced." (internal quotation marks omitted)). Accordingly, the Court focuses its attention solely on the presence of a 24% default interest rate.

Defendants' attack against the default interest rate is easily dismissed. Once the other default provisions are stripped away, the remaining default interest rate is 24%, which is *lower* than the 25% maximum legal rate of interest allowed in the criminal usury statute. *See* N.Y. Penal Law § 190.40 ("A person is guilty of criminal usury in the second degree when . . . he knowingly charges . . . as interest on the loan or forbearance . . . a rate exceeding twenty-five per centum."). What's more, "[w]hile the Second Circuit has not squarely ruled on the issue, the majority of district courts in this Circuit to have considered the issue have held that New York's

usury laws *do not apply* to default interest rates." *Blue Citi*, 338 F. Supp. 3d at 336 (emphasis added) (collecting cases). As noted in *Blue Citi*, while two district courts have recently determined that the usury laws do, in fact, apply to default interest rates, *see Union Capital*, 2017 WL 1406278, at *8; *Madden*, 237 F. Supp. 3d at 143, subsequent courts have expressly disagreed and instead have returned to the "overwhelming authority to the contrary." *See LG Capital. Funding, LLC v. One World Holding, Inc.*, No. 15 Civ. 698 (SJ), 2018 WL 3135848, at *12 (E.D.N.Y. June 27, 2018) (examining *Madden* and *Union Capital* and concluding that their reasoning was "not so convincing as to override the overwhelming authority to the contrary"); *see also Blue Citi*, 338 F. Supp. 3d at 336 ("[T]his Court is not persuaded by the authority cited in *Madden*. . . . [W]hile it is possible that the New York Court of Appeals will see the issue differently, this Court finds that the policy judgments underlying the usury laws do not apply to agreed-upon default interest rates. Rather, this Court concurs with the majority view in this Circuit that default interest provisions do not render a note usurious."). Thus, in line with the majority of courts in this Circuit, the Court holds that Defendants cannot maintain a usury defense based on the Note's default interest rate.

* * * * *

In sum, the Court rejects Defendants' argument that the Note is criminally usurious. Defendants' cross-motion for judgment on the pleadings is therefore denied.

### B.  EMA's Motion for Partial Summary Judgment

EMA moves for partial summary judgment. Specifically, EMA seeks full summary judgment on its claims for breach of contract and breach of guaranty; it seeks partial summary

judgment on its claim for reasonable attorneys' fees and expenses; [10] and it requests that the

Court issue a permanent injunction requiring AIM-Inc. to honor the terms of the Note and SPA,

including any future Notices of Conversion. In opposing summary judgment, Defendants mainly

rely on the now-rejected argument that the Note is criminally usurious, and they concede most of

the material facts giving rise to EMA's claims.[11] Below, the Court addresses each claim in turn.

### 1. EMA's Claim for Breach of Contract

EMA is entitled to summary judgment as a matter of law on its claim for breach of

contract. "Under New York law, a breach of contract claim requires proof of (1) an agreement,

(2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."

*Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). Here, the

following is undisputed: (1) EMA and AIM-Inc. entered into a valid agreement; (2) pursuant to

---

[10] EMA maintains that the total amount of attorneys' fees it's owed cannot be calculated until the conclusion of this action. Therefore, it seeks summary judgment as to liability only, and it requests permission to file a supplementary motion containing a full calculation of attorneys' fees at the end of this action. *See* Pl.'s Mem. at 19.

[11] In their moving papers, Defendants also argue that the Court should deny summary judgment because EMA has violated the implied covenant of good faith and fair dealing. See Defs.' Mem. at 22–24. However, breach of the implied covenant of good faith and fair dealing is an affirmative defense that must be raised in an answer, and Defendants did not include that defense in their Answer. Consequently, EMA asks the Court to find that Defendants' have waived this defense. Pl.'s Reply at 21–22. Ordinarily, "[t]he failure to raise an affirmative defense in the answer to the complaint constitutes a waiver of the defense unless the Court grants leave to amend the pleadings pursuant to Fed. R. Civ. P. 15." *Sudul v. Comp. Outsourcing Servs.*, Inc., 917 F. Supp. 1033, 1044 (S.D.N.Y. 1996) (citing *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994)). However, even in the absence of a motion to amend, defendants in this Circuit have been allowed to raise new affirmative defenses in response to a plaintiff's motion for summary judgment "as long as there was no prejudice to plaintiff[] from the belated assertion of the defenses." *Charney v. Zimbalist*, No. 07 Civ. 6272 (GWG), 2014 WL 963734, at *5 (S.D.N.Y. Mar. 12, 2014) (collecting cases). Here, while EMA protests consideration of Defendants' argument, EMA does not allege that it would be prejudiced as a result thereof. Accordingly, the Court considers— and rejects—Defendants' argument on the merits.

"Under New York law, parties to an express contract are bound by an implied duty of good faith, 'but breach of that duty is merely a breach of the underlying contract.'" *Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 736 F. App'x 274, 278 (2d Cir. 2018) (quoting *Harris v. Provident Life & Accident Ins.*, 310 F.3d 73, 80 (2d Cir. 2002)). Here, Defendants fail to explain how EMA breached its obligations under the contract in any manner. Instead, Defendants contend that EMA breached its implied duty of good faith and fair dealing by "knowingly charging unconscionable rates of interest and assuring an absolute repayment grotesquely over the amount of the principal loan"—a rehash of its criminal usury defense. Defs.' Mem. at 23–24. Given that the Court has rejected Defendants' criminal usury defense, it also rejects this argument.

that agreement, EMA provided AIM-Inc. with $40,000 in exchange for repayment of the $40,000 at a 12% interest rate per annum, in addition to the option to convert any such portion of the principal and interest into shares of AIM-Inc. common stock; (3) AIM-Inc. failed to live up to several of its obligations, resulting in breach;[12] and (4) EMA suffered damages resulting from AIM-Inc.'s breach.

The Court finds unclear, however, the extent of damages suffered by EMA and is therefore unable to award damages in this Opinion & Order. EMA asks the Court to award $587,713.44 in damages resulting from AIM-Inc.'s failure to honor EMA's first Notice of Conversion, in which EMA sought to convert $642.05 of the Note into 2,334,744 shares of AIM-Inc. common stock;[13] and $603,229.95 in damages resulting from AIM-Inc.'s failure to honor EMA's second Notice of Conversion, in which EMA sought to convert $23,772.61 of the Note into 29,715,761 shares of AIM-Inc. common stock. In reaching these figures, however, EMA employs a series of "discounts" to the Conversion Price, at least some of which the Court cannot accept at this time.[14] Consequently, while summary judgment is granted to EMA on the question

---

[12] As mentioned previously, *see supra* Part I.C., Defendants concede that they failed to honor EMA's two Notices of Conversion and that they failed to establish new share reserves of common stock after switching transfer agents, in violation of the Note and SPA. *See* Answer ¶¶ 32–33, 35–37; Defs.' Mem. at 3–4, Todhunter Decl. ¶¶ 14–17.

[13] The Court notes that the first Notice of Conversion reflects that EMA wanted to convert $64.20 of the Note, not $642.05. *See* Preston Decl. Ex. G., Doc. 19-4. EMA claims this was a typographical error, *see* Pl.'s Mem. at 9, and Defendants do not dispute that claim, *see* Defs.' Rule 56.1 Resp. ¶ 20.

[14] For example, in calculating the Conversion Price in each Notice of Conversion, EMA starts with a Conversion Price that purportedly equals 55% of the "lowest sale price for the Common Stock on the Principal Market during the twenty (20) consecutive Trading Days immediately preceding" the conversion dates. Defs.' Rule 56.1 Resp. ¶ 24. However, EMA does not provide evidence confirming the lowest sale price of AIM-Inc. common stock during the twenty days immediately preceding each conversion date. EMA also employs an additional 15% discount to the Conversion Price pursuant to section 1.2 of the Note, which allows for the discount "if the Note cannot be converted into free trading shares after 181 days from the issuance date." To support its entitlement to this discount, EMA claims that the Note could not be converted into free trading shares as of March 24, 2016—the date it describes as 181 days from the Note's issuance—because Defendants failed to establish a share reserve after switching transfer agents. *See* Pl.'s Mem. at 10. However, EMA does not explain why AIM-Inc.'s failure to establish a share reserve prevented it from converting the Note. And it remains unclear how EMA determined that March 24, 2016, was 181 from the Note's issuance date, given that the Note was issued on September 17, 2015, *see* Note at 1, and 181 days thereafter is March *16*, 2016. In its supplemental briefing, EMA should address these issues.

of Defendants' liability, the Court will withhold a finding as to the extent of EMA's damages pending supplemental briefing by the parties.

### 2. EMA's Claim for Breach of Guaranty

EMA is entitled to summary judgment as a matter of law on its claim for breach of guaranty against AIM-SA. "A guaranty is a collateral promise to answer for the payment of a debt or obligation of another, in the event the first person liable to pay or perform the obligation fails." *Prof'l Merch. Advance Capital*, 2015 WL 4392081, at *5 (internal quotation marks omitted). "The elements of a claim for breach of guarant[y] under New York law are (1) an underlying obligation, (2) a guarant[y], and (3) failure by the guarantor to make payment in accordance with the terms of the guarant[y]." *Id.* (quoting *Diller v. Schick*, No. 96 Civ 4140 (AGS), 1998 WL 91099, at *2 (S.D.N.Y. Mar. 2, 1998)). Here, in signing the SPA, AIM-SA guaranteed the prompt and complete payment and performance by AIM-Inc. of all the amounts and obligations due under the Note. *See supra* Part I.A.7; Defs.' Rule 56.1 Resp. ¶ 49. Accordingly, summary judgment to EMA will be granted on this claim.

### 3. EMA's Entitlement to Default Interest

As noted above, the Note provides for a 24% interest rate per annum in the event of default. *See supra* Parts I.A.5, III.A.2.(c). EMA requests enforcement of this provision, and Defendants have not offered any reason why this Court should not grant EMA's request. Accordingly, the Court concludes that EMA is entitled to a 24% default interest rate in accordance with the terms of the Note.[15]

---

[15] The Court, in this Opinion & Order, makes no finding as to whether—and, if so, to what extent—EMA is entitled to pre-judgement interest.

### 4. EMA's Entitlement to Permanent Injunction

The Court will deny EMA's request for equitable relief in the form of a permanent injunction that requires AIM-Inc. to honor the terms of the agreements. "A permanent injunction may issue only when the movant demonstrates '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Union Capital LLC v. 5Barz Int'l Inc.*, No. 16 Civ. 6203 (KBF), 2016 WL 8794475, at *2 (S.D.N.Y. Oct. 5, 2016) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "The traditional cases in which damages cannot adequately compensate a plaintiff involve goods that are unique (such as real estate) or goods that are difficult to value." *Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc.*, No. 13 Civ. 3860 (CM), 2014 WL 12776748, at *16 (S.D.N.Y. May 23, 2014). The decision to grant or deny permanent injunctive relief is within the Court's equitable discretion. *eBay Inc.*, 547 U.S. at 391.

Here, EMA contends that it will suffer irreparable harm absent a permanent injunction in this case because (1) Defendants have already consented to injunctive relief by virtue of the Note and SPA, which specifically contemplate injunctive relief in the event of default; and (2) Defendants' repeated failure to honor its notices of conversion, to establish reserves of shares, and to stay current with its SEC filings deprives EMA of its bargained-for rights under the terms of the agreements. Defendants, in their moving papers, do not contest entry of injunctive relief.

At the outset, the Court rejects EMA's argument that it is entitled to a permanent injunction because the parties "consented" to injunctive relief in the event of default. Like other courts in this District, "[t]his Court is aware of no authority indicating that such a contract

provision entitles the plaintiff to a *per se* finding of irreparable harm." *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 Civ. 1979 (PKL), 2007 WL 950092, at *6 (S.D.N.Y. Mar. 28, 2007); *accord Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("[C]ontractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."). Instead, the Court, like others, will treat such a provision as *persuasive* evidence that EMA will suffer from irreparable harm absent an injunction, rather than dispositive evidence. *See, e.g.*, *Alpha Capital Aktiengesellschaft v. Advanced Viral Research Corp.,* No. 02 Civ. 10237 (GBD), 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003) (affording "great weight" to a contractual provision stipulating that irreparable harm would result upon breach of the contract).

EMA contends that it will lose its bargained-for rights under the terms of the agreements absent a permanent injunction, resulting in irreparable harm. The Court disagrees. EMA contracted for the right to obtain AIM-Inc. shares—i.e., to obtain equity in AIM-Inc.—in lieu of monetary repayment. But here, EMA has not alleged that such shares are unavailable on the open market,[16] and the value of such shares on a given date will likely be undisputed. Under circumstances like these, courts in this District are generally loath to award injunctive relief. *See, e.g.*, *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (denying request to award publicly traded stocks upon plaintiff's successful prosecution of action because there was "no reason why money damages would not adequately compensate [plaintiff] for [defendant's] breach"); *Iroquois Master Fund*, 2014 WL 12776748, at *16 ("Where a plaintiff

---

[16] The (assumed) availability of AIM-Inc. shares on the open market distinguishes this case from others in which courts have found it appropriate to award shares of stock in lieu of legal damages. *See Laurus Master Fund, Ltd. v. Versacom Int'l, Inc.,* No. 02 Civ. 5340(LTS), 2003 WL 21219791, at *4 (S.D.N.Y. May 21, 2003) ("Because there are insufficient outstanding shares for Laurus to purchase all of the shares owing to it under the financing agreements on the open market, Laurus cannot obtain the interest in the company for which it contracted by purchasing the shares on the open market. In light of these circumstances, Laurus has no adequate remedy at law.").

claims that a defendant breached a contract by failing to deliver . . . publicly traded stock, money damages can adequately compensate the plaintiff for his loss."); *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 618 F. Supp. 2d 280, 299 (S.D.N.Y. 2009) ("[T]he extraordinary remedy of specific performance is not warranted. . . . There is no dispute that Aristocrat shares are available in the open market, and the values of those shares on a given date are undisputed."); *cf. Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971) ("The exceptional instances in which . . . specific performance [is] allowed [is] not applicable to this case. . . . If plaintiff were anxious to own the shares rather than obtain their value, he [i]s free to purchase them in the market."). Accordingly, EMA's request for a permanent injunction is denied.

### 5. EMA's Entitlement to Attorneys' Fees and Reasonable Expenses

EMA is entitled to summary judgment on the question of Defendants' liability for EMA attorneys' fees and expenses related to bringing this action. "Under New York law, parties may contract for the indemnification of attorneys' fees and expenses." *Blue Citi*, 338 F. Supp. 3d at 341 (citing *Hooper Assocs. v. AGS Computs., Inc.*, 548 N.E.2d 903 (N.Y. 1989)). "The fee applicant bears the burden of establish entitlement to an award and documenting the appropriate hours expended and hourly rates," *id.* (brackets omitted) (quoting *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994)), and "trial courts enjoy considerable discretion in determining the appropriate amount of attorney fees," *Weitzman v. Stein*, 98 F.3d 717, 720 (2d Cir. 1996)).

Here, section 4.5 of the Note provides that EMA is entitled to recoup "the costs of collection, including reasonable attorneys' fees," upon default by AIM-Inc. Moreover, section 10(a) of the SPA provides that "[t]he prevailing party shall be entitled to recover from the other

party its reasonable attorney's fees and costs." Defendants do not dispute that AIM-Inc. agreed to pay all costs and expenses incurred by EMA in collecting amounts owed under the Note and that AIM-SA agreed to guaranty AIM-Inc.'s obligations under the Note. *See* Defs.' Rule 56.1 Resp. ¶¶ 48–49. Consequently, summary judgment in favor of EMA as to Defendants' liability for attorneys' fees and expenses incurred in bringing this action is granted, with the exact amount of the award to be determined later.

*  *  *  *  *

In sum, the Court will grant summary judgment in favor of EMA as to liability on its claims for breach of contract, breach of guaranty, and reasonable attorneys' fees and expenses, with the exact amount of damages, fees, and expenses to be determined later. The Court will deny EMA's request for a permanent injunction.

## IV.  CONCLUSION

For the reasons stated above, EMA's motion for partial summary judgment is GRANTED in part and DENIED in part, and Defendants' cross-motion for judgment on the pleadings is DENIED. EMA shall file a supplemental motion and proposed order of judgment setting forth the exact amount of contractual damages, applicable interest, attorneys' fees, and expenses it seeks by March 1, 2019; Defendants shall file a brief in opposition to the motion and proposed order, if any, by March 15, 2019; and EMA shall file a reply, if any, by March 22, 2019. The Clerk of Court is respectfully directed to terminate the motions, Docs. 18, 27.

It is SO ORDERED.

Dated: February 19, 2019
       New York, New York

Edgardo Ramos, U.S.D.J.