UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMA FINANCIAL, LLC,

                Plaintiff,

– against –

AIM EXPLORATION, INC. and AIM EXPLORATION, SA,

                Defendants.

**OPINION & ORDER**

18 Civ. 145 (ER)

RAMOS, D.J.:

EMA Financial, LLC ("EMA") brings suit against AIM Exploration, Inc. ("AIM-Inc.") and AIM Exploration, SA ("AIM-SA"), alleging breach of several agreements related to EMA's purchase of a convertible promissory note from AIM-Inc. In a previous Order, the Court granted in part and denied in part EMA's motion for summary judgment, and it denied Defendants' cross-motion for judgment on the pleadings. Doc. 31. However, the Court could not decide the issue of damages on the record before it. *Id.* Before the Court is EMA's supplemental motion for partial summary judgment on the issue of damages and fees only. Doc. 32. The motion is unopposed. For the reasons stated below, the motion is GRANTED in part and DENIED in part.

**I.    BACKGROUND**

The Court assumes familiarity with the facts and procedural history of the case, which are set forth in its previous decision. *See EMA Fin., LLC v. AIM Expl., Inc.*, 18 Civ. 145 (ER), 2019 WL 689237 (S.D.N.Y. Feb. 19, 2019). The facts detailed below are only those relevant to the instant motion.[1]

---

[1] These facts are reproduced in part from the Court's previous Order and summarized in part from EMA's unopposed Rule 56.1 Statement, Doc. 35.

**A. The Note, SPA, and TA Letter**

On September 17, 2015, AIM-SA, AIM-Inc., and EMA executed a Securities Purchase Agreement ("SPA"). *See* Doc. 33, Ex. B ("SPA"). The SPA provided for the purchase by EMA of a 12% Convertible Redeemable Promissory Note (the "Note"), issued on that same date, from AIM-Inc. *Id*. at 1. Pursuant to the Note, EMA tendered to AIM-Inc. $40,000. In exchange for the $40,000, AIM-Inc. promised to repay EMA $40,000, together with interest on the unpaid principal balance at the rate of 12% per annum, by September 17, 2016—the Note's maturity date. Doc. 33, Ex. A ("Note") at 1. In the SPA, AIM-SA guaranteed to EMA the "prompt and complete payment and performance" of AIM-Inc.'s obligations under the Note. SPA at 23.

Notwithstanding that AIM-Inc. agreed to repay principal and interest owed to EMA by September 17, 2016, the Note and SPA contained several provisions that provided EMA with the option to convert the outstanding balance of the Note into shares of AIM-Inc. common stock in lieu of monetary repayment. Below, the provisions relevant to the instant motion are reprinted in summary fashion.

*1. Conversion Rights*

As the title "*Convertible* Redeemable Promissory Note" suggests, in Section 1.1 of the Note the parties agreed that EMA would hold the right to convert any portion of the amount outstanding on the Note into shares of AIM-Inc. common stock. Specifically, AIM-Inc. agreed that EMA

> shall have the right, in its sole and absolute discretion, at any time and from time to time to convert all or any part of the outstanding amount due under this Note into fully paid and non-assessable shares of [c]ommon [s]tock . . . or any shares of capital stock or other securities of [AIM-Inc.'s] into which such [c]ommon [s]tock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion")[.]

Note § 1.1.

*2. Conversion Price*

In Section 1.2 of the Note, the parties agreed that the Conversion Price would be set as follows:

> The conversion price . . . shall equal the lower of: (i) the closing sale price of the [c]ommon [s]tock on the Principal Market on the Trading Day immediately preceding the Closing Date, and (ii) 55% of the lowest sale price for the [c]ommon [s]tock on the Principal Market during the twenty (20) consecutive Trading Days immediately preceding the Conversion Date, *provided, however*, . . . if the closing sale price at any time falls below [$]0.10 then such 55% figure . . . shall be reduced to 40%. Additionally, . . . if the Note cannot be converted into free trading shares after 181 days from the issuance date, an additional 15% discount will be attributed to the Conversion Price.

*Id.* § 1.2.

*3. Share Reserves and Transfer Agent Instructions*

In Section 1.3 of the Note, the parties agreed that AIM-Inc. would hold in reserve for EMA enough authorized and unissued shares of AIM-Inc. common stock to allow EMA to convert the outstanding balance on the Note into AIM-Inc. shares:

> [AIM-Inc.] covenants that [it] will at all times while this Note is outstanding reserve from its authorized and unissued [c]ommon [s]tock a sufficient number of shares, free from preemptive rights, to provide for the issuance of [c]ommon [s]tock upon the full conversion of this Note. [AIM-Inc.] is required at all times to have authorized and reserved four (4) times the number of shares that is actually issuable upon full conversion of this Note. . . . Initially, [AIM-Inc.] will instruct the Transfer Agent to reserve seven hundred and thirty thousand (730,000) shares of common stock in the name of [EMA] for issuance upon conversion hereof.

*Id.* § 1.3.

To effectuate transfer of common stock upon conversion, Section 5 of the SPA required AIM-Inc. to provide certain "irrevocable instructions" to its transfer agent:

> Upon receipt of a duly executed Notice of Conversion, [AIM-Inc.] shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of [EMA] or its nominee, for the Conversion Shares in such amounts as specified from time to time by [EMA] to [AIM-Inc.] upon conversion of the Note, or any part

thereof, in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions").

SPA § 5. To that end, on the same date of the Note's execution, AIM-Inc. wrote a letter to its transfer agent that instructed it to register and reserve "a sufficient number of shares" (initially, 730,000) for EMA in case of conversion. *See* Doc. 33, Ex. C (the "TA Letter"). The TA Letter also provides that

> [t]he amount of [c]ommon [s]tock so reserved may be increased, from time to time, by written instructions of [EMA] without any further action or confirmation by [AIM-Inc.]. [EMA] shall have the right to periodically request, without any further action or confirmation by [AIM-Inc.], that the number of Reserved Shares be increased so that the number of Reserved Shares at least equals 400% of the number of shares of [AIM-Inc.] common stock issuable upon conversion of the Note.

*Id.* at 1 (emphasis omitted). On March 9, 2016, AIM-Inc. switched transfer agents, but failed to establish a share reserve with the new agent. Doc. 35 ¶ 11.

### 4. Notice of Conversion

Pursuant to Section 1.4 of the Note, EMA may convert to common stock any portion of the amount owed to it under the Note by submitting to AIM-Inc. a Notice of Conversion. Note § 1.4(a). This section also provides that AIM-Inc. was required to deliver the stock within three business days of receipt of a Notice of Conversion. *Id.* § 1.4(d).

### 5. Default Provisions and Injunctive Relief

The Note describes several events that would constitute default under the Note. Upon default, the Note becomes "immediately due and payable" to EMA. *Id.* § 3.16. Moreover, the Note provides that EMA could collect a "default sum," defined as "the then outstanding principal amount of th[e] Note to the date of payment plus the amounts referred to in clauses (x), (y), and (z)" of the Note.[2] *Id.* The Note also provides that

---

[2] "Clause (x)" of the Note refers to "accrued and unpaid interest on the unpaid principal amount of th[e] Note to the date of payment;" "clause (y)" refers to the default interest accrued on the then-outstanding principal and unpaid interest; and "clause (z)" refers to any amounts owed to EMA as a result of its conversion of principal to shares of common stock. *See* Note § 3.16.

4

"[a]ny amount of principal or interest . . . which is not paid when due shall bear interest at the rate of twenty-four (24%) per annum from the due date thereof until the same is paid ("Default Interest")." Note at 1.

### B. The Notices of Conversion

On April 5, 2016, EMA submitted a Notice of Conversion seeking to convert $642.05 of the Note principal into 2,334,744 shares of AIM-Inc.'s stock at $0.000275 per share (the "First Notice of Conversion"). [3] Doc. 35 ¶¶ 13, 20; Doc. 33, Ex. D. On January 10, 2017, EMA submitted a second Notice of Conversion seeking to convert $23,772.61 of the Note principal into 29,715,761 shares of AIM-Inc.'s stock at $0.0008 per share (the "Second Notice of Conversion"). Doc. 35 ¶¶ 14, 30; Doc. 33, Ex. E. In arriving at the conversion prices, EMA took account of the following events:

- The lowest stock price in the twenty days prior to April 5, 2016 was $0.0011. Doc. 33, Ex. F. (Because AIM-Inc. effectuated a 1:250 reverse stock split on April 25, 2016, the adjusted price was $0.275 ($0.011*250). Doc. 35 ¶ 22.)
- The lowest stock price in the twenty days prior to January 10, 2017 was $0.0032. Doc. 33, Ex. H.
- On January 12, 2016, AIM-Inc.'s stock price fell below $0.1 (pre-split), allowing EMA to convert shares at 40% of the lowest stock price in the twenty days prior to the conversion date, as per Section 1.2 of the Note. Doc. 35 ¶¶ 18, 28; Doc. 33, Ex. K.
- EMA was unable to convert the Note into free trading shares 181 days after the issue date, due, at least in part, to AIM-Inc.'s switch to a transfer agent that was not bound by the TA Letter and to AIM-Inc.'s failure to establish the reserves necessary to account for conversions, as required by Section 1.3 of the Note, Section 5 of the SPA, and the TA Letter. Therefore, EMA calculated that it was entitled to an additional 15% discount on the conversion price, as per Section 1.2 of the Note. Doc. 35 ¶¶ 19–20, 29–30.

AIM-Inc. failed to honor either of these Notices of Conversion. *Id.* ¶ 15.

The weighted average trading price of AIM-Inc.'s shares three business days after the First Notice of Conversion was sent was $0.252, as adjusted post-reverse stock split.

---

[3] As EMA notes, the First Notice of Conversion contained several errors, including an error in the amount it sought to convert and an error in the conversion price. Doc. 35 at ¶ 13 n.11. However, EMA avers that the number of shares it sought to convert—2,334,744—was correct. *Id.*

*Id.* ¶ 24; Doc. 33, Ex. G. Therefore, the value of 2,334,744 shares on April 8, 2016 was $588,355.49. Doc. 35 ¶ 24. The weighted average trading price of AIM-Inc. shares three business days after the Second Notice of Conversion was sent was $0.0211. *Id.* ¶ 33; Doc. 33, Ex. I. Therefore, the value of 29,715,761 shares on January 13, 2017 was $627,002.56. Doc. 35 ¶ 34. EMA maintains that is owed $587,713.44 ($588,355.49 minus $642.05) in damages for AIM-Inc.'s failure to deliver the stock in accordance with the First Notice of Conversion, *id.* ¶ 24; and $603,229.95 ($627,002.56 minus $23,772.61) in damages for AIM-Inc.'s failure to deliver the stock in accordance with the Second Notice of Conversion, *id.* ¶ 35.

## C. The Summary Judgment Order

On February 19, 2019, the Court denied Defendants' motion for judgment on the pleadings and EMA's request for a permanent injunction, and it granted EMA's motion for summary judgment on its claims for breach of contract and breach of guarantee. *See EMA Fin., LLC*, 2019 WL 689237. However, the Court found that the extent of damages resulting from these breaches was unclear, and it requested supplemental briefing on these issues. *Id.* at *11–12. In particular, the Court stated that:

> [I]n calculating the Conversion Price in each Notice of Conversion, EMA starts with a Conversion Price that purportedly equals 55% of the "lowest sale price for the [c]ommon [s]tock on the Principal Market during the twenty (20) consecutive Trading Days immediately preceding" the conversion dates. However, EMA does not provide evidence confirming the lowest sale price of AIM-Inc. common stock during the twenty days immediately preceding each conversion date. EMA also employs an additional 15% discount to the Conversion Price pursuant to section 1.2 of the Note, which allows for the discount "if the Note cannot be converted into free trading shares after 181 days from the issuance date." To support its entitlement to this discount, EMA claims that the Note could not be converted into free trading shares as of March 24, 2016—the date it describes as 181 days from the Note's issuance—because Defendants failed to establish a share reserve after switching transfer agents. However, EMA does not explain why AIM-Inc.'s failure to establish a share reserve prevented it from converting the Note. And it remains unclear how EMA determined that March 24, 2016, was 181 from the Note's issuance date, given that the Note was issued on

6

> September 17, 2015, and 181 days thereafter is March *16*, 2016. In
> its supplemental briefing, EMA should address these issues.

*Id.* at *11 n.14. The Court also found that EMA was entitled to a 24% interest rate in accordance with the terms of the Note and to attorneys' fees and expenses. *Id.* at *12–13.

### D. Procedural History

EMA filed suit against Defendants on January 9, 2018, alleging breach of contract and breach of guarantee and seeking a permanent injunction against AIM-Inc., damages, and an award of costs and expenses. Doc. 1. On February 9, 2018, Defendants answered EMA's complaint. Doc. 12. EMA moved for summary judgment on April 16, 2018, Doc. 18, and Defendants cross-moved for judgment on the pleadings on May 30, 2018, Doc. 27. The Court denied Defendants' motion and granted in part and denied in part EMA's motion. Doc. 31; *see EMA Fin., LLC*, 2019 WL 689237. In the Order, the Court directed the parties to submit supplemental briefs on the issue of damages. *EMA Fin., LLC*, 2019 WL 689237 at *13. EMA did so by way of a motion for partial summary judgment on March 1, 2019. Doc. 32. Shortly thereafter, on March 4, 2019, Defendants' attorney moved to withdraw as counsel. Doc. 37. The Court granted this request and directed Defendants to retain new counsel. Doc. 39. Defendants failed to retain new counsel and failed to respond to EMA's supplemental motion for summary judgment on the issue of damages. On April 15, 2019, EMA wrote the Court to request that it find Defendants in default and that it award damages as set forth in its motion for partial summary judgment. Doc. 41. It renewed these requests on December 3, 2019. Doc. 44.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material"

if it might affect the outcome of the litigation under the governing law. *Id.* (citation omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citation omitted). The nonmovant must then "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id*. (citation omitted).

In deciding a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmovant and resolves all ambiguities and draws all reasonable inferences against the movant. *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). The nonmovant, however, may not rely on unsupported assertions or conjecture in opposing summary judgment. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Rather, the nonmovant "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

"Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bears Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004).

### III. DISCUSSION

EMA argues that it is entitled to $1,215,357 in damages, plus default interest and attorney's fees. In particular, EMA seeks $603,229.95 under the First Notice of Conversion and $587,713.44 under the Second Notice of Conversion; default interest of 24%; the balance of the Note, which it alleges is $61,461.92; and $12,982.95 in attorney's fees and costs. The Court addresses each of these requests in turn.

8

### A. Damages Due Under the Notices of Conversion

Under New York law, "the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Kenford Co. v. Cnty. of Erie*, 73 N.Y.2d 312, 319 (1989). To prove damages, "[a] plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110–111 (2d Cir. 2007) (internal quotation marks and citation omitted). "[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer." *Washington v. Kellwood Co.*, No. 05 Civ. 10034 (MHD), 2015 WL 6437456, at *12 (S.D.N.Y. Oct. 14, 2015) (internal quotation marks omitted) (citing *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977)).

In similar cases, courts in this Circuit have found that "[t]o award damages for this [kind of] breach, the Court would take the date of the breach and determine the conversion price [Plaintiff] was entitled to on that date, the number of shares [Plaintiff] was authorized to convert, and the market price of those shares on the date of breach." *Union Capital LLC v. Vape Holdings, Inc.*, No. 16 Civ. 1343 (RJS), 2017 WL 1406278, at *6 (S.D.N.Y. Mar. 31, 2017). EMA argues that the Court should adopt a similar formula here, and the Court agrees. The only outstanding issue is whether EMA is entitled to the two discounts it claims.

First, EMA claims that it is entitled to a discount because the stock price fell below $0.1. Doc. 36 at 8, 11–12. Section 1.2 of the Note states that

> The conversion price . . . shall equal . . . 55% of the lowest sale price for the [c]ommon [s]tock on the Principal Market during the twenty (20) consecutive Trading Days immediately preceding the Conversion Date, *provided, however*, . . . if the closing sale price at any time falls below [$]0.10 then such 55% figure . . . shall be reduced to 40%.

9

On January 12, 2016, the stock price fell to $17.5. Doc. 33, Ex. K. As adjusted for the 1:250 reverse stock split on April 25, 2016, the price was $0.07 ($17.5/250). Because this is below $0.1, EMA is entitled to this discount.

Second, EMA claims that it is entitled to a further 15% discount because it was not able to convert the Note into free trading shares 181 days after the issue date. Doc. 36 at 8–9, 12. Section 1.2 of the Note provides that "if the Note cannot be converted into free trading shares after 181 days from the issuance date, an additional 15% discount will be attributed to the Conversion Price." EMA claims that this discount applies because AIM-Inc.'s change of transfer agent and failure to establish a share reserve prevented it from converting the Note. In its previous Order, the Court requested clarification on this point.[4] *EMA Fin. LLC*, 2019 WL 689237, at *11 n.14. In its current briefing, EMA explains that, under the TA Agreement, AIM-Inc.'s transfer agent had irrevocable instructions to maintain a reserve and to process conversions. Because AIM-Inc. switched to a transfer agent that was not bound by the TA Agreement, that transfer agent was under no obligation to convert the Note into shares of stock (and, presumably, did not do so). Doc. 36 at 6. The Court is satisfied with this explanation and finds that this second discount also applies.

With these discounts in mind, EMA's calculations for damages due under the notices of conversion are correct. EMA's damages under the First Notice of Conversion are $587,713.44,[5] and its damages under the Second Notice of Conversion are

---

[4] The Court also noted that 181 days from the Note's issuance was March 16, 2016, not March 24, 2016, as EMA had claimed. EMA now agrees that this is the right date. Doc. 36 at 8 n.5. In any event, this date is not material to the substance of EMA's argument.

[5] The lowest market price twenty days prior to April 5, 2016 was $0.275, as adjusted post-reverse stock split, or $0.0011 pre-split ($0.275/250). Doc. 33, Ex. F. EMA was able to convert the Note into free trading shares at 25% of this price (40%-15%), or $0.000275 ($0.0011*.25). As per the First Notice of Conversion, EMA intended to convert 2,334,744 shares, or $642.0546 of the Note's principal ($0.000275*2,334,744). The value of 2,334,744 shares on April 8, 2016—when AIM-Inc. would have been required to deliver the stock to EMA, as per Section 1.4(d) of the Note—was $588,355.49. Doc. 35 ¶ 24.

$603,229.95.[6]  Its total damages for breach of contract and breach of guarantee is the sum of these, or $1,190,943.39.

### B. Default Interest

The Court further found in its previous Order, that EMA was entitled to a 24% default interest rate, as provided for in the Note. *See EMA Fin., LLC*, 2019 WL 689237, at *12. However, the Court made no finding as to whether—and to what extent—EMA was entitled to pre-judgment interest. *Id.* at *12, n.15. Pre-judgment interest is appropriate here. *See Graham v. James*, 144 F.3d 229, 239 (2d Cir. 1998) ("Under New York law, prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract") (internal quotation marks and citation omitted); *Koch v. Greenberg*, 14 F. Supp. 3d 247, 285 (S.D.N.Y. 2014) (awarding prejudgment interest in breach of contract case).

The Court will therefore award default interest of 24% on the sum of $587,713.44 from April 8, 2016 (the date of breach as it pertains to the First Notice of Conversion); and default interest of 24% on the sum of $603,229.95 from January 13, 2017 (the date of breach as it pertains to the Second Notice of Conversion). Calculated through March 1, 2019, when EMA filed this motion, such interest totals $717,444.64 for both Notices of Conversion combined. Doc. 33, Ex. M.

### C. The Balance of the Note

EMA also requests damages in the sum of the balance of the Note, plus default interest. Although the Court declined to enter a permanent injunction with respect to the balance of the Note, EMA argues that it is entitled to the balance of the Note under basic

---

$588,355.49 minus $642.0546 equals $587,713.435, which is rounded to $587,713.44 for purposes of this motion.

[6] The lowest market price twenty days prior to January 10, 2017 was $0.0032. Doc. 33, Ex. H. EMA was able to convert the Note into free trading shares at 25% of this price (40%-15%), or $0.0008. As per the Second Notice of Conversion, EMA intended to convert 29,715,761 shares, or $23,772.61 of the Note's principal ($0.0008*29,715,761). The value of 29,715,761 shares on January 13, 2017— when AIM-Inc. would have been required to deliver the stock to EMA, as per Section 1.4(d) of the Note—was $627,002.56. Doc. 35 ¶ 34. $627,002.56 minus $23,772.61 equals $603,229.95.

11

contract principles. The Court agrees. *See, e.g.*, *Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 239 (S.D.N.Y. 2011) ("[A] plaintiff in a breach of contract action may recover both general and consequential damages—amounts that compensate the plaintiff both for the value of the promised performance and for additional losses the plaintiff suffered due to the failure to perform." (collecting cases)).

EMA posits that the balance of the Note after the two Notices of Conversion and accounting for the 24% default interest with a default notice date of May 26, 2016, is $61,461.92. Doc. 33, Ex. M. However, there are two problems with this calculation: (1) EMA has not provided sufficient justification for this default notice date; and (2) the calculation does not appear to take into account the two Notices of Conversion. *Id.* As such, EMA is directed to provide a letter to the Court within two weeks with a corrected calculation.

### D. Attorney's Fees and Costs

Finally, EMA requests attorney's fees and costs in the amount of $12,982.95. Doc. 36 at 16–17. "Courts in this Circuit employ a presumptively reasonable fee standard to determine the amount to award as attorneys' fees, which boils down to what a reasonable, paying client would be willing to pay, given that such party wishes to spend the minimum necessary to litigate the case effectively." *Carco Grp., Inc. v. Maconachy*, No. 05 Civ. 6038, 2011 WL 6012426, at *2 (E.D.N.Y. Dec. 1, 2011) (internal quotation marks and citations omitted), *overturned on other grounds*, 718 F.3d 72 (2d Cir. 2013). In this case, EMA is being billed at an hourly rate of $375 per hour. Doc. 34 ¶¶ 2–3. This hourly rate is reasonable. *See, e.g.*, *Blue Citi, LLC v. 5Barz Int'l, Inc.*, 338 F. Supp. 3d 326, 342 (S.D.N.Y. 2018) (finding counsel's hourly rate of $375 reasonable). With its corrected calculation for the balance of the Note, EMA should provide an updated invoice so that the Court may award the appropriate attorney's fees and costs.

## IV. CONCLUSION

For the foregoing reasons, EMA's motion for partial summary judgment is GRANTED in part and DENIED in part. Within two weeks, EMA is directed to provide the Court with a corrected calculation as to its requested damages for the sum of the balance of the Note, as well as an updated invoice for attorney's fees and costs. The Clerk of Court is respectfully directed to terminate the motion, Doc. 32.

It is SO ORDERED.

Dated: March 30, 2020
New York, New York

EDGARDO RAMOS, U.S.D.J.